No. 26-1922

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,

Defendants-Appellants.

On Appeal from the U.S. District Court for the District of Rhode Island
No. 1:26-cv-00439-MSM-AEM
The Honorable Mary S. McElroy

# PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

NICHOLAS W. BROWN
Attorney General of Washington

ANDREW R.W. HUGHES
ALIANA KNOEPFLER
Assistant Attorneys General
CRISTINA SEPE
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
*Attorneys for State of Washington*

LETITIA JAMES
Attorney General of New York

RABIA MUQADDAM
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY
Special Trial Counsel
STEPHEN C. THOMPSON
Special Counsel
VICTORIA OCHOA
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
*Attorneys for State of New York*

PETER F. NERONHA
Attorney General of Rhode Island

KATHRYN M. SABATINI
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN
Unit Chief, Civil and Community Rights
Assistant Attorney General
LEONARD GIARRANO IV
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
*Attorneys for State of Rhode Island*

(Additional Counsel on Signature Page)

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. STATEMENT OF THE CASE .......... 3

A. Congress Created the Continuum of Care Program To Provide Stable Housing for Homeless Americans .......... 3

B. The CoC Program is Designed To Create Stable, Permanent Housing .......... 6

C. HUD Issues Fiscal Year 2025 NOFOs that Include Unlawful Conditions, and the District Court Entered Judgment in Favor of Plaintiff States .......... 9

D. HUD Issues a Fiscal Year 2026 NOFO that Includes Unlawful Conditions Concerning Permanent Housing .......... 10

E. The District Court Vacates the 2026 NOFO Because Defendants Bypassed Notice-and-Comment Requirements .......... 12

III. LEGAL STANDARD .......... 12

IV. ARGUMENT .......... 13

A. Defendants are Very Unlikely to Succeed on the Merits .......... 13

B. Defendants Will Not Suffer Irreparable Harm from Following the Law .......... 17

C. The Equities and Public Interest Favor the Plaintiffs .......... 18

V. CONCLUSION .......... 23

## TABLE OF AUTHORITIES

Cases

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) .......... 18

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025),
*cert. denied*, No. 25-899,
2026 WL 1871309 (U.S. June 30, 2026) .......... 17

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 12, 13

*Respect Maine PAC v. McKee*,
622 F.3d 13 (1st Cir. 2010) .......... 18

*United States v. Gordon*,
875 F.3d 26 (1st Cir. 2017) .......... 16

*United States v. Nashville, C. & St. L. Ry. Co.*,
118 U.S. 120 (1886) .......... 18

*Washington v. Dep't of Hous. & Urb. Dev.*,
C.A. No. 1:25-cv-00626-MSM-AEM,
2026 WL 1863886 (D.R.I. June 29, 2026) .......... 9, 10

*Washington v. Dep't of Hous. & Urb. Dev.*,
C.A. No. 1:26-cv-00439-MSM-AEM,
2026 WL 2279514 (D.R.I. Aug. 7, 2026) .......... 12, 13, 14, 16

*Washington v. Dep't of Hous. and Urb. Dev.*,
C.A. No. 1:25-cv-00626-MSM-AEM,
2025 WL 3721053 (D.R.I. Dec. 23, 2025) .......... 10

*Washington v. United States Dep't of Hous. & Urb. Dev.*,
171 F.4th 473 (1st Cir. 2026) .......... passim

## Statutes

42 U.S.C. § 11301(a) ....................................................................................3

42 U.S.C. § 11383 ........................................................................................3

42 U.S.C. § 11386a(b) ........................................................................ 5, 6, 14

42 U.S.C. § 11386b(a) ..................................................................................4

42 U.S.C. § 11386b(d) ......................................................................... passim

42 U.S.C. § 11386c(b) ..................................................................................4

Administrative Procedure Act,
5 U.S.C. §§ 551-559 ....................................................................................12

McKinney-Vento Homeless Assistance Act,
42 U.S.C. ch. 119.................................................................... 2, 12, 14, 17

## Regulations

24 C.F.R. § 10.1 ..................................................................................... 6, 13

24 C.F.R. § 10.2 ..............................................................................................6

24 C.F.R. § 10.7 ..............................................................................................6

24 C.F.R. § 10.8 ..............................................................................................6

24 C.F.R. § 10.9 ..............................................................................................6

24 C.F.R. § 10.10 ............................................................................................6

24 C.F.R. § 578.3 ............................................................................................3

24 C.F.R. § 578.37 ..........................................................................................3

24 C.F.R. § 578.37(a)......................................................................................8

Continuum of Care Homelessness Assistance Programs,
69 Fed. Reg. 27495 (May 14, 2004),
https://archives.hud.gov/funding/2004/cocpsec.pdf............................................9

Other Authorities

Alap Davé, *How one state almost solved America's homelessness problem*, Catalyst (2023),
https://www.bushcenter.org/catalyst/the-fix/
homes-for-the-unhoused-solving-homelessness-problem.....................................8

*Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing*,
Nat'l All. to End Homelessness (June 2, 2026),
https://endhomelessness.org/resources/hud-policy-
changes-threaten-efforts-to-end-homelessness/ ..................................... 11, 12, 20

Grants.gov, Related Documents,
*FY 2014 Notice of Funding Opportunity of Continuum of Care*,
https://grants.gov/search-results-detail/265408
(last visited Aug. 20, 2026) ........................................................................9

HUD, *Community Planning and Development* (2025),
https://www.hud.gov/sites/dfiles/CPD/documents/
FY2024_FY2025_CoC_and_YHDP_NOFO
_FR-6800-N-25.pdf...........................................................................................7

HUD, *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018),
https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf............................9

HUD, *Fiscal Year 2022-2026 HUD Strategic Plan* (2022),
https://archives.hud.gov/reports/FY2022-2026
HUDStrategicPlan.pdf........................................................................ 6, 7, 9

Josh Leopold & Mary K. Cunningham,
*To end homelessness, Carson should continue Housing First approach*, Urban Institute (Jan. 7, 2017),
https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-housing-first-approach ....................................................8

# I. INTRODUCTION

Congress created the Continuum of Care Program recognizing that homelessness is a crisis of instability, and that effective intervention requires immediate stabilization and uninterrupted support. Through the CoC Program, the Department of Housing and Urban Development distributes billions each year to state, local, and non-profit entities to provide housing and services to families and individuals facing homelessness, with the vast majority of funding directed to permanent housing and rental assistance projects that Congress has specifically found to be effective.

But over the past year, Defendants have thrown the CoC Program into chaos. In late 2025, Defendants published Notices of Funding Opportunity (NOFOs) for the CoC Program that would have devastated the program and severely strained states' homeless response programs. These NOFOs abruptly reversed HUD's statutory commitment to stability by capping the CoC funds that could be used for renewing permanent housing projects to thirty percent—down from nearly ninety percent. The cap would have evicted tens of thousands of Americans back into homelessness. Plaintiff States sued, and the district court ultimately concluded that Defendants acted arbitrarily and capriciously in instituting the cap.

Nonetheless, HUD published a new NOFO for FY 2026 that seeks to re-implement a cap on permanent housing. The 2026 NOFO does this through a

$1.3 billion “set aside” for transitional housing and supportive service-only grants, i.e., non-permanent housing projects. By making this $1.3 billion unavailable for permanent housing, this “set aside” caps permanent housing at around sixty-eight percent of CoC funds (the De Facto Cap). This Cap, too, would slash funding for permanent housing projects and place tens of thousands of formerly homeless individuals at risk of losing their housing.

Plaintiff States again sued, arguing, among other things, that the De Facto Cap was never authorized by Congress, is contrary to provisions in the McKinney-Vento Act requiring HUD to make renewals under most circumstances, and is contrary to provisions in the McKinney-Vento Act requiring HUD to undertake notice and comment before adopting incentives. The district court vacated the 2026 NOFO, concluding that HUD failed to engage in required notice-and-comment procedures before adopting the set-aside.

Defendants’ motion for a stay pending appeal should be denied. Defendants are unlikely to succeed on appeal; they rely entirely on arguments the district court correctly rejected as “undoubtedly” incorrect, “tortured,” and “specious.” Nor do the other stay factors favor defendants. Defendants cannot claim irreparable harm from being required to follow the law. And to the extent the district court’s vacatur of their unlawful NOFO puts them in a time crunch, that is a problem of their own making. They knew the McKinney-Vento Act’s requirements from the start but

chose to ignore their statutory obligations. Defendants also cannot show that the balance of equities or public interest favors them because breaking the law is neither equitable, nor in the public interest. And while they are correct that their haphazard approach has potentially put CoC applicants—like the State Plaintiffs and National Alliance to End Homelessness (NAEH) Plaintiffs—in a difficult spot, they cannot rely on their own refusal to follow the law to force through unlawful policies that will irreparably harm the Plaintiffs and the public. Their motion should be denied.

## II. STATEMENT OF THE CASE

### A. Congress Created the Continuum of Care Program To Provide Stable Housing for Homeless Americans

Congress passed the McKinney-Vento Homeless Assistance Act to address the "immediate and unprecedented crisis" of homelessness. 42 U.S.C. § 11301(a)(1). Congress has directed that CoC funding "shall be used to carry out projects that serve homeless individuals or families[,]" including permanent housing, permanent supportive housing for individuals with disabilities (including mental health and substance use issues), rapid rehousing, supportive services, the Homeless Management Information System, and homelessness prevention. *See* 42 U.S.C. § 11383; 24 C.F.R. § 578.37.

HUD issues grants to local coalitions—known as "Continuums of Care"—pursuant to a NOFO. Each Continuum represents a "geographic area," for example, a county or multi-county region within a state. 24 C.F.R. § 578.3.

To ensure housing stability, the McKinney-Vento Act directs HUD to prioritize renewal of existing projects. It provides that "[t]he sums made available" under the CoC program "shall be available for the renewal of contracts . . . at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations[.]" 42 U.S.C. § 11386c(b). The HUD "Secretary shall determine whether to renew a contract for such a permanent housing project on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary." *Id.*; *see also* 42 U.S.C. § 11386b(a)(2) (requiring that "[i]n calculating the portion of" CoC funds for certain new permanent supportive housing, "the Secretary shall not count funds made available to renew contracts for existing projects under section 11386c"). By prioritizing renewals of existing projects, Congress wrote the statute to ensure that programs can continue to provide stable housing to formerly homeless individuals, and that millions of formerly homeless individuals and families are not evicted back to homelessness.

On top of this funding earmarked for renewals, CoC funding is competitive in two respects. First, HUD awards grants competitively to applicants within a Continuum. That is, when a Continuum applies to the NOFO, it will rank projects within its geographic area, and HUD will select projects for awards within each

Continuum's application up to at least the formula amount. Second, the McKinney-Vento Act specifically instructs HUD on how CoC funds shall be awarded by including lengthy "Required Criteria" for assessing grant applications such as "the previous performance of the recipient regarding homelessness" with respect to the length of time individuals remain homeless and related factors, whether the recipient will incorporate "comprehensive strategies for reducing homelessness" such as permanent supportive housing, and many other specific factors. 42 U.S.C. § 11386a(b).

The Act directs HUD to award "bonuses [and] other incentives to geographic areas for using funding . . . for activities that have been proven to be effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals . . . set forth in" the CoC statutes. 42 U.S.C. § 11386b(d)(1).

By statute, these "proven strategies" include:

- "[P]ermanent supportive housing for chronically homeless individuals and families";
- "[F]or homeless families, rapid rehousing services, short-term flexible subsidies to overcome barriers to rehousing, support services concentrating on improving incomes to pay rent, coupled with performance measures emphasizing rapid and permanent rehousing and with leveraging funding from mainstream family service systems"; and

- "[A]ny other activity determined by the Secretary, based on research *and after notice and comment to the public*, to have been proven effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals as set forth in section 11386a(b)(1)(F) of this title.

42 U.S.C. § 11386b(d)(2)(A)-(C) (emphasis added). The statute does not include temporary (i.e., transitional) housing or support service-only projects as "proven strategies." Additionally, the "independent living goals" that are referred to in the above provisions concern "achieving independent living in permanent housing." *Id.* § 11386a(b)(1)(F)(ii).

In addition to the statutory notice and comment requirement for providing incentives, HUD's policies require it to proceed by notice and comment rulemaking generally for "matters that relate to . . . grants," "even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. §§ 10.1, 10.2, 10.7-10.10.

**B. The CoC Program is Designed To Create Stable, Permanent Housing**

Until the unlawful 2025 NOFOs, HUD implemented the CoC Program to further its policy of "implement[ing] a Housing First approach to reducing homelessness, and driv[ing] equitable community development."[1] According to

[1] HUD, *Fiscal Year 2022-2026 HUD Strategic Plan* 18 (2022), https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf.

HUD, Housing First "prioritizes rapid placement and stability in permanent housing in which admission does not have preconditions (such as sobriety or a minimum income threshold) and in which housing assistance is not conditioned upon participation in services."[2] HUD adopted its Housing First approach in recognition of the fact that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success."[3] According to HUD's most recent strategic plan, "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services."[4] As this Court has recognized, Housing First "has proven effective: One study shows that Housing First programs decreased homelessness in a sample set of communities by 88 percent, far outpacing alternative 'Treatment First' strategies[.]" *Washington v. United States Dep't of Hous. & Urb. Dev.* (*Washington II*), 171 F.4th 473, 480 (1st Cir. 2026).

The core Housing First intervention is "permanent housing"—including "permanent supportive housing" and "rapid rehousing"—in which individuals are provided stable housing "without a designated length of stay."

---

[2] HUD, *Community Planning and Development* 17 (2025), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf.

[3] *See supra* note 1 at 25.

[4] *Id.* at 26.

24 C.F.R. § 578.37(a)(1). The McKinney-Vento Act specifically incorporates a Housing First approach. For example, as noted above, the law directs that "[t]he Secretary shall provide bonuses or other incentives . . . for activities that have been proven to be effective at reducing homelessness[,]" including "permanent supportive housing," and "rapid rehousing services[.]" 42 U.S.C. § 11386b(d). And to the extent HUD wishes to "provide . . . incentives" for "other activit[ies]," it may only do so "based on research and after notice and comment to the public[.]" 42 U.S.C. § 11386b(d)(2)(C).

Consistent with these statutory provisions, HUD employed a Housing First and permanent supportive housing approach since at least 2004—until it abruptly changed course last year.[5] Prior NOFOs and Funding Opportunity Descriptions from 2004 to the present reflect HUD's longstanding commitment to "permanent supportive housing" to "meet the long-term needs of homeless individuals and families" and "Housing First" as one of HUD's "Policy Priorities."[6] HUD's most

[5] Alap Davé, *How one state almost solved America's homelessness problem*, Catalyst (2023), https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-problem (George W. Bush Administration adopted Housing First program in 2004 as part of its goal to end homelessness); Josh Leopold & Mary K. Cunningham, *To end homelessness, Carson should continue Housing First approach*, Urban Institute (Jan. 7, 2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-housing-first-approach (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

[6] *See, e.g.*, Continuum of Care Homelessness Assistance Programs, 69 Fed. Reg. 27495, 27497-98 (May 14, 2004),

recent strategic plan (for Fiscal Years 2022-2026) explicitly provides that HUD will "implement a Housing First approach to reducing homelessness[.]"[7] This policy is explicitly incorporated throughout HUD's most recent, lawful NOFO, for FY 2024-2025. "[C]onsistent with its Housing First approach[,]" HUD has in recent years "dedicated the vast majority of its funding to supporting permanent housing programs[.]" *Washington v. Dep't of Hous. & Urb. Dev.* (*Washington I*), C.A. No. 1:25-cv-00626-MSM-AEM, 2026 WL 1863886, at *2 (D.R.I. June 29, 2026).

### C. HUD Issues Fiscal Year 2025 NOFOs that Include Unlawful Conditions, and the District Court Entered Judgment in Favor of Plaintiff States

Defendants have now tried to cast aside HUD's longstanding commitment to Housing First and fundamentally and unlawfully undermine the CoC program. In two NOFOs published in November and December 2025, HUD purported to implement a thirty percent cap on CoC funding going to permanent housing renewals, as well as a thirty percent cap on "Tier 1" funding—essentially, funding that guaranteed renewals for existing projects, and stability for the people living in those projects. The 2025 NOFOs also included a host of other unlawful conditions.

---

https://archives.hud.gov/funding/2004/cocpsec.pdf; Grants.gov, Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*, https://grants.gov/search-results-detail/265408 (last visited Aug. 20, 2026); HUD, *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf.

[7] *See supra* note 1 at 18.

Plaintiff States sued in November 2025, and the district court preliminarily enjoined HUD's 2025 NOFO, as well as the challenged conditions therein. Order, *Washington v. Dep't of Hous. and Urb. Dev.*, C.A. No. 1:25-cv-00626-MSM-AEM, 2025 WL 3721053 (D.R.I. Dec. 23, 2025). The district court denied Defendants' motion to dissolve the injunction, and this Court then denied Defendants' motion to stay the injunction. *Washington II*, 171 F.4th at 473.

On June 29, 2026, the district Court granted Plaintiff States' motion for summary judgment, setting aside HUD's issuance of the 2025 NOFOs. *See Washington I*, 2026 WL 1863886.

### D. HUD Issues a Fiscal Year 2026 NOFO that Includes Unlawful Conditions Concerning Permanent Housing

On June 1, 2026, HUD issued a "FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO" with an application due date of August 26, 2026 (the "2026 NOFO"). ECF No. 35-1.[8]

Like its predecessor, the 2026 NOFO again unlawfully attempts to reverse HUD's decades-long Housing First policy. Whereas the 2025 NOFOs attempted to do so by placing an unauthorized and arbitrary cap on renewal funding for permanent housing projects, the 2026 NOFO does so by purporting to create a $1.3 billion "set-aside . . . for new projects with a priority for Transitional Housing and

[8] ECF cites are to the district court docket.

Supportive Service Only projects." ECF No. 35-1 at 36-37. By making $1.3 billion of the $4.04 billion in CoC appropriations unavailable for permanent housing, this set-aside caps the amount of funds that can go to permanent housing at roughly sixty-eight percent of total available CoC funds.[9]

The De Facto Cap, if allowed to go into effect, would drastically cut funding for permanent housing projects. "As of 2025, the CoC program funded nearly 7,000 projects, with approximately 87 percent of that funding dedicated to permanent housing." *Washington II*, 171 F.4th at 480. By capping permanent housing at sixty-eight percent, the De Facto Cap will cause programs to lose funding, which means residents would lose housing. According to estimates from the National Alliance to End Homelessness, this shift to funding temporary programs will result in "**at least 97,000 residents** of CoC-funded permanent housing [being] at risk of losing their housing," which it states is a low-end estimate. *Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing*, Nat'l All. to End Homelessness (June 2, 2026), https://endhomelessness.org/resources/hud-policy-changes-threaten-efforts-to-end-homelessness/ (emphasis in original). In New York, for example, where approximately ninety-two percent of CoC funding goes to permanent housing, the

[9] While Congress appropriated $4.01 billion for CoC funding for FY 2026, HUD has total CoC funding of approximately $4.04 billion for FY 2026. ECF No. 35-1 at 7.

NOFO, including the De Facto Cap, is estimated to strip CoCs within the state of over $129 million, causing over 8,700 people to lose their housing. *Id.* In Washington, some 2,900 people are at risk of losing stable housing due to the De Facto Cap. *Id.* And in California, it is a staggering 14,900 people. *Id.*

### E. The District Court Vacates the 2026 NOFO Because Defendants Bypassed Notice-and-Comment Requirements

Shortly after HUD released the new NOFO, Plaintiffs filed suit. The district court granted summary judgment to Plaintiff States, agreeing that HUD violated the APA by issuing the 2026 NOFO without first engaging in the notice-and-comment process mandated by the McKinney-Vento Act, and vacating the 2026 NOFO. *Washington v. Dep't of Hous. & Urb. Dev.*, C.A. No. 1:26-cv-00439-MSM-AEM, 2026 WL 2279514, at *2 (D.R.I. Aug. 7, 2026) (*Washington III*).

Specifically, the district court held that HUD's attempt to deemphasize Housing First through the $1.3 billion set-aside constitutes an incentive under 42 U.S.C. § 11386b(d)(2)(C), but that HUD failed to engage in the notice-and-comment process required by that subsection. *See Washington III*, 2026 WL 2279514 at *3.

## III. LEGAL STANDARD

"A stay is an 'intrusion into the ordinary processes of administration and judicial review,' . . . and accordingly 'is not a matter of right[.]'" *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citations omitted). On a stay request, courts consider:

"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426 (citation omitted).

## IV. ARGUMENT

### A. Defendants are Very Unlikely to Succeed on the Merits

The district court correctly concluded that the De Facto Cap was unlawfully adopted without notice-and-comment. As the court explained, 42 U.S.C. § 11386b(d) "clearly requires HUD to engage in a public notice-and-comment process" before adopting new incentives for transitional housing or supportive service-only grants. *Washington III*, 2026 WL 2279514 at *3. Beyond that, HUD's own regulations require it to engage in notice and comment "with respect to *all* HUD programs and functions, *including* matters that relate to. . . grants, . . . *even though such matters would not otherwise be subject to rulemaking* by law or Executive policy." 24 C.F.R. § 10.1 (emphasis added). Here, Defendants unilaterally created a $1.3 billion set-aside specifically for the purpose of incentivizing more transitional housing and service-only programs. ECF No. 35-2 at 13-14. Accordingly, the district court rightly concluded that "HUD violated the APA's requirement to observe proper procedures as required by law when it issued

the 2026 NOFO without first engaging in the public notice-and-comment procedure required" by the McKinney-Vento Act. *Washington III*, 2026 WL 2279514, at *3.

None of Defendants' countervailing arguments is likely to succeed on appeal.

First, Defendants claim that a $1.3 billion set-aside, reserved exclusively for transitional housing and service-only projects, is not an incentive. Emerg. Mot. for Stay Pending Appeal (Stay Mot.) at 5. But as the district court correctly explained, "HUD's decision to set aside this colossal amount of grant funding undoubtedly incentivizes grantees to conform their CoC programs to HUD's goals in order to obtain a realistic chance of obtaining this funding." *Washington III*, 2026 WL 2279514, at *3. Defendants contend that "under that reasoning, any selection criteria or requirement would also be a bonus or other incentive within the meaning of 42 U.S.C. § 11386b(d)," which would undermine the Secretary's authority to consider selection criteria he "determines to be appropriate to carry out this part in an effective and efficient manner," 42 U.S.C. § 11386a(b)(1)(G). *See* Stay Mot. at 5. But this argument is based on the fundamentally incorrect premise that the Secretary's "effective and efficient manner" authority gives him *carte blanche* to adopt whatever policies he wants. Whatever limited power the Secretary retains to ensure program efficiency and effectiveness, Congress has made clear that if the Secretary wants to incentivize "activities" for "reducing homelessness" beyond permanent supportive housing and rapid rehousing, the agency must engage in notice and comment first.

42 U.S.C. § 11386b(d). Because setting aside $1.3 billion in dedicated funding is an incentive, Defendants are unlikely to succeed on this argument.

Second, Defendants wrongly argue that Congress created a notice-and-comment requirement applicable only to "mandatory" incentives but gave the Secretary untrammeled discretion to otherwise skip the notice-and-comment requirement. Stay Mot. at 6. This argument is plainly contravened by the statute. The statute lays out types of programs the Secretary "shall" incentivize—permanent supportive housing and rapid re-housing—and then says that if the Secretary wishes to incentivize "*any other activity*," HUD must "determine[] . . . , based on research and after notice and comment to the public," that such other activity achieves the statutory goal of reducing homelessness. 42 U.S.C. § 11386b(d)(2)(C) (emphasis added). The notice-and-comment requirement thus broadly applies to all other activities not listed, and the Secretary does not have discretion to ignore Congress' clear command.

Defendants further misconstrue the statute in pointing to a separate provision in which Congress specifically identified types of incentives that HUD "shall not implement[.]" Stay Mot. at 7 (quoting 42 U.S.C. § 11386b(d)(3)). This statutory language restricts the types of "other activit[ies]" that the Secretary can incentivize "based on research and after notice and comment to the public[.]" 42 U.S.C. § 11386b(d)(2)(C). In other words, the Secretary cannot use the identified

incentives even after engaging in research and notice and comment. But it does not allow the Secretary to forego notice-and-comment for incentives that are not barred.

Defendants fare no better in arguing that "HUD practice support[s]" their idiosyncratic reading of the statute. Stay Mot at 8. An agency practice cannot rewrite a statute. *See United States v. Gordon*, 875 F.3d 26, 33 (1st Cir. 2017). In any event, Defendants do not identify a single "HUD practice" that remotely resembles setting aside $1.3 billion in dedicated funding for activities that Congress has not deemed effective in reducing homelessness, without at least engaging in the statutorily required notice and comment. The district court thus properly rejected Defendants' "tortured" and "unorthodox" reading of the statute. ECF No. 41 at 8.

Finally, Defendants err in contending that they did engage in notice and comment of a sort by issuing public notices about their intent to change the CoC program and holding stakeholder forums. Stay Mot. at 8-9. As the district court correctly concluded, "HUD's specious argument that the [McKinney-Vento Act] provides it with the ability to engage in some vague, undefined, and informal version of the notice-and-comment process lacks even marginal support from the text, structure, or history" of the statute. *Washington III*, 2026 WL 2279514, at *9. Notice-and-comment is a well-defined, well-understood set of requirements that Defendants cannot meet with generalized press releases and forums with curated guest lists. In any event, Defendants cannot point to a single instance in which they publicly

proposed the De Facto Cap or a $1.3 billion set-aside prior to the 2026 NOFO and received public feedback. Accordingly, even if they were entitled to employ an ad hoc "Notice and Comment Lite" procedure, they failed to do even that.

### B. Defendants Will Not Suffer Irreparable Harm from Following the Law

Defendants also cannot meet their burden to show irreparable harm absent a stay. Their primary argument is that the district court's order prevents HUD "from implementing its congressional mandate to set housing policies and priorities." Stay Mot. at 11. But "[t]he Government is not irreparably harmed by an injunction . . . that bars enforcement of . . . unlawful" policies. *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025), *cert. denied*, No. 25-899, 2026 WL 1871309 (U.S. June 30, 2026); *see also Washington II*, 171 F.4th at 492 ("irreparable harm does not arise from a preliminary injunction that prohibits an agency from taking action that is likely unlawful").

Defendants are not aided by their argument that HUD is facing a December 1, 2026 congressional deadline to make CoC awards. *See* Stay Mot. at 10-11. When Congress sets a deadline for an agency, that is a deadline to act lawfully, not an invitation to forego substantive statutory requirements. Here, Defendants knew (or should have known) that the McKinney-Vento Act required them to engage in notice and comment, but they failed to follow this statutory mandate. They can—perhaps they must—now act extremely quickly to promulgate

a new NOFO without the unlawful De Facto Cap. But they cannot invoke an impending deadline to excuse their unlawful conduct. *See Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010) (emergency of appellants' "own making" could not support equitable relief); *Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) (self-inflicted injury cannot support stay); *see also United States v. Nashville, C. & St. L. Ry. Co.*, 118 U.S. 120, 125 (1886) (noting "the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided").

### C. The Equities and Public Interest Favor the Plaintiffs

Finally, the balance of equities and public interest weigh sharply against Defendants. Defendants try to meet their burden by pointing to harms to CoC grantees. *See* Stay Mot. 12. But many of those grantees are currently before the court—here and in the *NAEH* case—and they have presented detailed evidence that they will suffer irreparable harm from implementing the De Facto Cap.

In connection with Plaintiff States' challenge to the FY 2025 NOFO, this Court both found that Defendants could not dispute Plaintiffs' "uncontested evidence that allowing HUD to enforce the [FY 2025 NOFO] would wreak havoc: In anticipation of potential funding cuts, housing programs and support services would be ended or drastically curtailed, personnel would be laid off, and

relationships with local housing and service providers would be ruined." *Washington II*, 171 F.4th at 493. "And of course, the plaintiffs submitted ample evidence that an implementation of the [FY 2025 NOFO] would be immediately destabilizing and disastrous for their constituents." *Id.*

The same irreparable harms would follow here from a stay. The De Facto Cap will irreparably harm Plaintiff States by upending the foundation of their homelessness response programs, which have been built on HUD's Housing First programming for decades. This will directly result in a disastrous increase in the number of individuals experiencing homelessness in Plaintiff States, which will in turn result in a devastating increase in the reliance on already overburdened state emergency services.

The number of stably housed individuals at risk of losing their residence and potentially entering homelessness as a direct result of the De Facto Cap and similar conditions in the 2026 NOFO is staggering. As just a few examples, approximately 700 permanent housing subsidies are at risk in Connecticut. ECF No. 36-9 at 5-6. Approximately 15,000 individuals are at risk in California. ECF No. 36-5 at 4. Approximately 3,733 individuals in Illinois. ECF No. 36-13 at 5. In Kentucky, the number is approximately 630. ECF No. 36-14 at 14, 16-17. In New Jersey, it is approximately 2,573. ECF No. 36-21 at 4-5. In Pennsylvania, it is approximately 5,148. ECF No. 36-24 at 3. And in Washington, it is approximately 2,900.

ECF No. 36-1 at 6-7. Altogether, the National Alliance to End Homelessness projects the 2026 NOFO's shift to funding temporary programs will result in at least 97,000 residents of CoC-funded permanent housing being at risk of losing their housing,[10] and Plaintiff States' declarations demonstrate that tens of thousands of those individuals reside in the Plaintiff States. Defendants flatly ignore these harms.

These mass evictions will also harm the Plaintiff States by shifting enormous costs to other state public services. For example, because "[p]oor health and chronic disease such as hypertension, lung disease, and heart disease are common among adults experiencing homelessness" while "many lack access to regular care or a primary care provider," homeless individuals "often end up engaging with the health care system in higher cost, more urgent settings, such as emergency departments and inpatient facilities." ECF No. 36-5 at 4-5. With potentially tens of thousands of stably housed individuals at risk of homelessness because of Defendants' unlawful shift in programming, Plaintiff States will experience "significant financial strain on [their] other state public services, including medical systems, state- and federally-funded behavioral-health providers, and child-welfare programs serving unhoused families." ECF No. 36-13 at 10-11; *see also* ECF No. 36-5 at 5; ECF No. 36-9 at 4; ECF No. 36-19 at 5 ("Reducing already-limited rental assistance

---

[10] *Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing*, *supra*, at 14.

resources will logjam the shelter system."); ECF No. 36-19 at 5; ECF No. 36-22 at 8; ECF No. 36-24 at 4-6; ECF No. 36-25 at 5; ECF No. 36-27 at 5; ECF No. 36-23 at 5; ECF No. 36-10 at 5; ECF No. 36-26 at 3; ECF No. 36-28 at 4; ECF No. 36-2 at 7; ECF No. 36-16 at 6 ("Increased unsheltered homelessness will result in increased costs for emergency services such as police, fire, EMS, shelter, hospitals, and jails by $125 million annually in Maryland.").

Moreover, the De Facto Cap will irreparably harm *all* permanent housing projects by creating uncertainty about whether future funding is available, meaning that subrecipients cannot "enter into leases, hire staff, and plan agency budgets accordingly while ensuring compliance with regulations" that require initial leases to cover at least one year. ECF No. 36-15 at 7-8; *see also* ECF No. 36-16 at 4-5. Subrecipients may "be unable to agree to full year leases as required by applicable regulations, may need to stop accepting referrals to preserve funding under their current grants, may need to lay-off staff, cease hiring for open positions, or be forced to take other similar actions." ECF No. 36-15 at 8-9.

The operational burdens created by the drastic changes in the 2026 NOFO are also substantial. Plaintiff States, which have relied heavily on the predictability of the CoC program for decades, must now "revise program policies, modify coordinated entry and referral practices, retrain staff, restructure service delivery models, amend funding applications, and reevaluate existing partnerships" while

also reconciling the new federal requirements with sometimes conflicting state requirements. *See, e.g.*, ECF No. 36-11 at 6, 11; *see also* ECF No. 36-19 at 4; ECF No. 36-19 at 12-13, 19-20; ECF No. 36-27 at 4-5; ECF No. 36-13 at 4, 8-9; ECF No. 36-21 at 5; ECF No. 36-6 at 7, 9-10; ECF No. 36-18 at 6-7; ECF No. 36-4 at 6; ECF No. 36-16 at 11; ECF No. 36-2 at 6-8; ECF No. 36-3 at 5-6. Additionally, many states make substantial investments in homelessness and supportive housing that are dependent on the existence of CoC-funded capacity and rely on and are intertwined with predictable CoC funding. *See, e.g.*, ECF No. 36-13 at 12-14; ECF No. 36-6 at 3-5; ECF No. 36-20 at 2-3; ECF No. 36-28 at 8.

"[T]he resulting implementation costs and challenges are ultimately to the detriment of those who currently benefit from [Plaintiff States' permanent supportive housing] project[s] and are on the path to self-sufficiency and recovery. They are scared and confused." ECF No. 36-18 at 7. "Beyond the re-traumatization and destabilization likely to result for impacted individuals and families, people may end up back on the streets and others—like survivors of domestic violence—may face the impossible choice of returning to an abuser or enduring unsheltered homelessness." ECF No. 36-15 at 5; *see also* ECF No. 36-28 at 5-6.

In summary, the 2026 NOFO will result in a "cascading crisis" for Plaintiff States, where "CoCs will be forced to reduce [permanent and rapid rehousing] programs; state funded permanent housing sites will face immediate operating

shortfalls; and thousands of individuals currently stably housed will face an increased risk of eviction or program displacement." ECF No. 36-7 at 11. It is neither equitable nor in the public interest to unleash these harms.

## V. CONCLUSION

This Court should deny Defendants' Motion to Stay.

RESPECTFULLY SUBMITTED on August 21st, 2026.

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES
ALIANA KNOEPFLER
Assistant Attorneys General
CRISTINA SEPE
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Cristina.Sepe@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY
Special Trial Counsel
STEPHEN C. THOMPSON
Special Counsel
VICTORIA OCHOA
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov
*Attorneys for Plaintiff State of New York*

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ Hayleigh S. Crawford*
HAYLEIGH S. CRAWFORD
Deputy Solicitor General
WILLIAM Y. DURBIN
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL
Deputy Attorney General
MICHAEL L. NEWMAN
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD
LAUREN GREENAWALT
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov
*Attorneys for Plaintiff State of California*

**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov
*Attorney for Plaintiff State of Connecticut*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ
Deputy Solicitor General
NORA PASSAMANECK
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov
Nora.Passamaneck@coag.gov
*Attorneys for Plaintiff State of Colorado*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Caroline S. Van Zile*
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General
for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
202-724-6609
Caroline.VanZile@dc.gov
*Attorney for Plaintiff District of Columbia*

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

/s/ Ian R. Liston
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
ROBIN L. JACOBS
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
Vanessa.Kassab@delaware.gov
Robin.Jacobs@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**KWAME RAOUL**
Attorney General of Illinois

/s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
312-814-5202
sarah.hunger@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

/s/ S. Travis Mayo
S. TRAVIS MAYO
General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Laurac.Tipton@ky.gov
*Attorneys for Plaintiff Office of the Governor*
*ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky*

**AARON M. FREY**
Attorney General of Maine

/s/ Katherine W. Thompson
KATHERINE W. THOMPSON
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Tompson@maine.gov
*Attorney for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ James C. Luh
JAMES C. LUH
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
JLuh@oag.maryland.gov
*Attorney for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ Michelle Pascucci
KATHERINE DIRKS
Chief State Trial Counsel
MICHELLE PASCUCCI
NITA KLUNDER
State Trial Counsel
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

/s/ Neil Giovanatti
NEIL GIOVANATTI
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov
*Attorney for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

/s/ Brian S. Carter
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.Carter@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

*/s/ Daniel Resler*
DANIEL RESLER
Assistant Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@njoag.gov
*Attorney for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
ASamant@nmdoj.gov
*Attorney for the State of New Mexico*

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Robert A. Koch*
ROBERT A. KOCH
Attorney-in-Charge, Civil & Administrative Appeals
Oregon Department of Justice
1162 Court St NE
Salem, OR 97301
Tel: 503-378-4402
Robert.a.koch@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

**JENNIFER C. SELBER**
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER
STEPHEN R. KOVATIS
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
717-460-6786
*Attorneys for Plaintiff Governor Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE
Solicitor General
SAM STRATTON
Assistant Attorney General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov
Sam.Stratton@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**JAY JONES**
Attorney General of Virginia

*/s/ Megan C. Keenan*
MEGAN C. KEENAN
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Attorneys for Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the response contains 5,152 words. The document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Times New Roman typeface.

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES