NO. 26-1922

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,

Defendants-Appellants.

PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANTS-APPELLANTS' SUPPLEMENTAL MEMORANDUM

This Court has asked the parties to respond to two questions in connection with Defendants-Appellants' "Emergency Motion for Stay Pending Appeal." In response to this Court's Order and Defendants-Appellants' Supplemental Memorandum, Plaintiffs-Appellees hereby offer the following supplemental response.

**Question 1: Does 42 U.S.C. § 11382(a) provide the Secretary with discretion to make a set-aside of Continuum of Care funds so long as there are sufficient funds to comply with the congressionally mandated set-asides under 42 U.S.C. § 11386b(a) & (b)?**

No. 42 U.S.C. § 11382(a) does not provide the Secretary discretion to implement a $1.3 billion set-aside, even if there are sufficient funds to comply with the congressionally mandated set-asides under 42 U.S.C. § 11386b(a) & (b). In any

event, under the FY 2026 NOFO, the $1.3 billion set-aside does not leave funds sufficient to comply with 42 U.S.C. § 11386b(a) and (b). And even if both of those things were not true, the incentive restrictions of 42 U.S.C. § 11386b(d) operate independently of the specific set-asides in 42 U.S.C. § 11386b(a) & (b).

### 1. 42 U.S.C. § 11382(a) does not provide the Secretary with discretion to make a $1.3 billion set-aside of Continuum of Care funds

To start, the Secretary lacks the discretion to implement a $1.3 billion set-aside for transitional and supportive-service only projects, regardless of whether there are sufficient funds to comply with the congressionally mandated set-asides. This is so for several reasons.

First, rather than granting discretion, 42 U.S.C. § 11382(a) specifically instructs the Secretary to use "the selection criteria described in section 11386a of this title," and Section 11386a includes detailed required criteria. The set-aside conflicts with HUD's obligation to evaluate projects based on these statutorily "[r]equired [c]riteria" including "the extent to which the recipient will . . . incorporate comprehensive strategies for reducing homelessness," which by statute includes strategies "proven to be effective at reducing homelessness" like "*permanent supportive housing*" and "*rapid rehousing*[.]" 42 U.S.C. §§ 11386a(b)(1)(B)(iv); 11386b(d)(2) (emphasis added). The set-aside here turns these legal obligations on their head, punishing applicants for doing the things the McKinney-Vento Act requires HUD to prioritize.

Under basic principles of administrative law, HUD lacks the authority to create a massive set-aside out of whole cloth. "HUD cannot compel [grantees] to comply with requirements that Congress never authorized it to impose." *County of King v. Turner*, No. 25-3664, 2026 WL 2489361, at *13 (9th Cir. Aug. 25, 2026); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) ("Congress has" the "power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds."). Here, the McKinney-Vento Act details the "[r]equired criteria" HUD must use in awarding CoC funds, 42 U.S.C. § 11386a, and which "certification[s]" are required from project sponsors, 42 U.S.C. § 11386(b)(4), but it does not grant HUD any authority to impose a de facto cap on permanent housing via a "set-aside." If Congress had wanted to create such a set-aside, it would have done so through much clearer language. Indeed, it created set-asides in the recent Transportation, Housing and Urban Development, and Related Agencies Appropriations Act of 2026 (THUD Act) for things like providing services for victims of domestic violence and programs specific to youth homelessness, *but not for transitional housing and/or service-only projects*. *See* THUD Act, Pub. L. No. 119-75, 140 Stat. 173, 399-400 (Feb. 3, 2026).

Moreover, as noted in this Court's question, Congress created certain set-asides specifically for new permanent housing projects under 42 U.S.C. § 11386b(a) and (b). Congress could have similarly empowered HUD to

create a set-aside to prioritize or incentivize transitional housing or service-only projects. But Congress did not do that. Indeed, Congress did the opposite by directing HUD to incentivize permanent housing and rapid re-housing, and restricting HUD from offering similar incentives for other types of programs unless HUD could demonstrate by "research and after notice and comment to the public" that the programs "have been proven effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals[.]" *Id.* § 11386b(d)(2)(C); *see also Washington v. United States Dep't of Hous. & Urb. Dev.* (*Washington II*), 171 F.4th 473, 480 (1st Cir. 2026) ("HUD may identify and fund other effective strategies, but it may do so only 'based on research and after notice and comment to the public.'") (quoting 42 U.S.C. § 11386b(d)(2)(C)). HUD simply does not have the authority to impose the set-aside it seeks to impose here without at least satisfying the statutory requirements for such a set-aside. *See City of Providence v. Barr*, 954 F.3d 23, 39 (1st Cir. 2020).

Nonetheless, as they have all along, Defendants contend that 42 U.S.C. § 11386a(b)(1)(G) permits the Secretary to adopt essentially any priorities he wishes because it ends a long list of required selection criteria by providing that the Secretary may consider "such other factors as the Secretary determines to be appropriate to carry out this part in an effective and efficient manner."

Defs.' Suppl. Mem. at 2. Just last week, the Ninth Circuit correctly rejected such an open-ended reading of nearly identical language in another part of the same statute. *See King County*, 2026 WL 2489361 at *10-13. As that court explained, in "interpret[ing] a residual clause," courts "'give effect, if possible, to every clause and word' of the statute, considering both 'the specific context' of the provision and 'the broader context of the statue as a whole.'" *Id.* at *11 (quoting *Fischer v. United States*, 603 U.S. 480, 486 (2024)). Here, Defendant's proffered reading of the residual clause does not square with the remainder of the statute. Indeed, the very same statutory section on which Defendants rely to implement the set-aside requires them to evaluate applications based on the applicants' ability to "incorporate [the] comprehensive strategies" from "section 11386b(d)," i.e., the very statute the district court held Defendants violated in adopting the set-aside. *See Washington v. Dep't of Hous. & Urb. Dev.* (*Washington III*), C.A. No. 1:26-cv-00439-MSM-AEM, 2026 WL 2279514, at *3 (D.R.I. Aug. 7, 2026). Because the residual clause does not empower Defendants to do what the statute otherwise forbids, Defendants' reading of the statute is incorrect.

HUD lacks authority to impose the set aside for an additional reason: Congress made clear that the Secretary's "determin[ation] whether to renew" a project "shall" be made solely "on the basis of certification by the collaborative applicant . . . that (1) there is a demonstrated need for the project; and (2) the project complies with

program requirements and appropriate standards of housing quality and habitability[.]" 42 U.S.C. § 11386c(b). Thus, so long as the applicant makes this certification, HUD and the Secretary lack discretion to arbitrarily withhold funds that Congress directed HUD to spend on renewals. *Id.* Moreover, capping permanent housing at sixty-eight percent adds renewal factors beyond what Congress permitted HUD and the Secretary to consider. Under the set-aside, HUD will not only consider the statutorily required factors of demonstrated need and compliance with program requirements and habitability, but will now also apparently consider (and give dispositive weight to) whether renewal would exceed an arbitrary cap.[1]

**2. The $1.3 billion set-aside does not leave sufficient funds to comply with set-asides under 42 U.S.C. § 11386b(a)**

For the foregoing reasons, the Secretary lacks the discretion under 42 U.S.C. § 11382(a) to adopt a set-aside, irrespective of 42 U.S.C. § 11386b(a) and (b). But to make matters worse, the set-aside would not leave sufficient funds to comply with the set-asides mandated by 42 U.S.C. § 11386b(a).

In simple terms, 42 U.S.C. § 11386b(a) requires that thirty percent of CoC funds available under the CoC and a separate program, the Emergency Solutions Grant (ESG) Program, be devoted to permanent housing for individuals with

[1] Moreover, to the extent the Secretary had discretion here, the exercise of that discretion was arbitrary and capricious. *See* ECF No. 34 at 39-52.

disabilities or their families.[2] Subsection (2) provides that the set-aside applies only to funds for new projects, not renewals. 42 U.S.C. § 11386b(a)(2) ("In calculating the portion of the amount described in paragraph (1) that is used for activities that are described in paragraph (1), the Secretary shall not count funds made available to renew contracts for existing projects under section 11386c of this title.").

However, subsection (4) of the statute provides that set-aside "shall be suspended for any year in which funding available for grants under this part after making the allocation established in paragraph (1) would not be sufficient to renew for 1 year all existing grants that would otherwise be fully funded under this part." In other words, section 11386b(a)(4) requires HUD to prioritize the renewal of existing projects over the subsection (1) set-aside where the set-aside would prevent all projects eligible for renewal from being renewed. This leaves Defendants with only two options under section 11386b(a): they can either fund all renewals *and* set aside thirty percent of CoC funds for certain new permanent housing projects, or they must use the thirty percent of CoC funds that would otherwise be set aside under section 11386b(a) to fund renewals.

But Defendants seek to defund existing permanent housing projects while also taking advantage of the section 11386b(a)(4) suspension clause, which is triggered

---

[2] In total, for FY 2026, Congress appropriated $4.3 billion between the CoC ($4.01 billion) and ESG ($290 million) programs. THUD Act, 140 Stat. at 399.

by a lack of funding for existing permanent housing projects. Defs.' Suppl. Mem. at 3. They cannot do so.

The McKinney-Vento Act requires the Secretary to prioritize renewals. As this Court said last time the parties here were before it, 42 U.S.C. § 11386c(b) "provides for the 'renewal of contracts' for permanent-housing projects if 'there is a demonstrated need for the project' and 'the project complies with program requirements.'" *Washington II*, 171 F.4th at 481 (quoting 42 U.S.C. § 11386c(b)). Under this statutory renewal priority, the Secretary lacks the power to divert funds if doing so means there are insufficient funds left to renew eligible permanent housing projects. But the set-aside limits the availability of CoC funding for renewals and permanent housing to only sixty-eight percent of the total CoC award by removing $1.3 billion from the pool of available funds. Defendants do not contest that at least eighty-seven percent of the CoC funding is necessary to renew for 1 year all existing grants that would otherwise be fully funded under the CoC program. *Id*. at 480. By failing to fully fund renewals as required by the section 11386b(a)(4) suspension clause, the FY 2026 NOFO violates section 11386b(a).

### 3. 42 U.S.C. § 11382(a) does not provide the Secretary with discretion to make a set-aside of Continuum of Care funds even if there are otherwise sufficient funds to comply with set-asides under 42 U.S.C. § 11386b(a) and (b)

Finally, even if the Secretary otherwise had discretion under 42 U.S.C. § 11382(a) to adopt a set-aside Congress never approved, and even if the

FY 2026 NOFO left sufficient funds to comply with set-asides under 42 U.S.C. § 11386b(a) and (b), the incentive restrictions of 42 U.S.C. § 11386b(d) would still operate independently and require the Secretary to undertake notice-and-comment before adopting a new incentive program.

42 U.S.C. § 11386b(a) and (b) provide mandatory set-asides for permanent housing. 42 U.S.C. § 11386b(d) does something different: it requires the Secretary to "provide bonuses or other incentives" for "activities that have been proven to be effective at reducing homelessness[.]" 42 U.S.C. § 11386b(d)(1). And Congress has specifically directed what sorts of activities should be incentivized, requiring that "activities that have been proven to be effective at reducing homelessness" include "permanent supportive housing" and "rapid rehousing." 42 U.S.C. § 11386b(d)(2). Insofar as the Secretary wishes to incentivize other activities, he must undertake "notice and comment to the public." *Id.*; *see Washington II*, 171 F.4th at 480.

Subsection (d) operates independently of subsections (a) and (b). Subsections (a) and (b) set mandatory (if sometimes suspended) minimums, while subsection (d) (not to mention the renewal provision of 42 U.S.C. § 11386c) instructs the Secretary how to prioritize CoC funding as a whole. Indeed, the notion that the Secretary might have discretion to do whatever he wants with CoC funding, so long as he adequately funds the set-asides under 42 U.S.C. § 11386b(a) and (b), would mean that section (d) does not do anything. This would "render[] an unnerving

amount of statutory text mere surplusage." *Fischer*, 603 U.S. at 498. Moreover, this reading is irreconcilable with the notice-and-comment requirement of 42 U.S.C. § 11386b(d)(2), which only applies when the Secretary seeks to do things that are outside the set-aside requirements of subsections (a) and (b). A reading which renders a statutory provision inapplicable in the only circumstances in which it would apply is plainly incorrect. *See In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643 (1978) (noting that courts should avoid interpretations of statutes that "would lead to absurd results . . . or would thwart the obvious purpose of the statute") (quotation omitted).

**Question 2: What is meant by "bonuses or other incentives" as that term is used in 42 U.S.C. § 11386b(d)(1)? Further, identify any regulations, policies, guidances, or other documents explaining how such "bonuses or other incentives" are provided.**

"In construing and applying statutory terms, [this Court] begin[s] by examining the language of the statute itself." *United States v. Knott*, 256 F.3d 20, 28 (1st Cir. 2001). The McKinney-Vento Act does not define "bonuses or other incentives" as the term is used in 42 U.S.C. § 11386b(d)(1). So then, courts should read statutory terms to convey their ordinary meaning, including as reflected in dictionary definitions. *See Knott*, 256 F.3d at 28; *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Dictionaries define the term "incentive" as "[s]omething that incites or encourages action or production[.]" *Incentive*, Black's Law Dictionary (12th ed. 2024); *see also Incentive*, Merriam-Webster.com,

https://www.merriam-webster.com/dictionary/incentives (last visited Sept. 2, 2026) ("something that incites or has a tendency to incite to determination or action"). An incentive is something that motivates or encourages a person or organization to take a particular action.

Defendants point to no regulations or guidance that would define "incentive" differently. *See* Defs.' Suppl. Mem. at 4. And Defendants' administrative record in this case repeatedly confirms that HUD views the $1.3 billion "set-aside" for transitional housing and supportive service-only grants as an incentive. HUD explains its creation of the "large set-aside for new [transitional housing] and [supportive-service only] projects," is consistent with its "intent to end Housing First and return the program to diverse solutions that *incentivize* self-sufficiency and recovery." HUD-AR-00054 (emphasis added).[3] The administrative record is replete with similar characterizations. *See, e.g.*, HUD-AR-00044 (explaining that the 2026 NOFO "includes rating criteria to *incentivize* the existence of and investment in" services (emphasis added)); HUD-AR-00053 (explaining HUD "seeks to *incentivize* and invest in" supportive services through "this competition" (emphasis added)); HUD-AR-00055 ("The NOFO consistently promotes and *incentivizes* reducing unsheltered homelessness and connecting individuals and families to

[3] Plaintiff States have attached the pages of the Administrative Record cited to herein as an Appendix to this Memorandum.

assistance and services that help those who are able recover and regain self-sufficiency." (emphasis added)); and HUD-AR-00061 (explaining the "NOFO *incentivizes* CoCs to partner with a wide array of treatment providers" and "to coordinate with behavioral healthcare providers" (emphasis added)).

Rather than offer a definition of bonuses or other incentives as used in 42 U.S.C. § 11386b(d)(1), as asked by this Court, Defendants argue that these funds can only apply to CoCs who fully implement the activities in subsection (d). *See* Defs.' Suppl. Mem. at 4; Defs.' Reply in Supp. of Emerg. Mot. for Stay Pending Appeal at 3. But this reading ignores the statutory structure Congress set out for incentives for proven strategies, which is separate from incentives for successfully implemented strategies. Defendants' reading does not give meaning and effect to all parts of the statute. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."); *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 141 (2017) (courts should "favor an interpretation that gives meaning to each statutory provision").

Under subsection (d)(1), Congress gave the Secretary the authority to provide for bonuses or other incentives. Congress then limited the kinds of activities the Secretary could include through subsection (d)(2) and restricted activities the Secretary can incentivize through subsection (d)(3). Then in a new subsection,

subsection (e), Congress directed HUD to relax how CoCs can use bonuses or incentives should CoCs successfully and fully implement the activities in subsection (d). *See* 42 U.S.C. § 11386b(e) ("If any geographic area demonstrates that it has fully implemented any of the activities described in subsection (d) . . . , that geographic area shall receive the bonus or incentive provided under subsection (d), *but* may use such bonus or incentive for any eligible activity[.]") (emphasis added). Defendants' proposed reading—that bonuses and incentives can only be awarded to applicants who fully implement (d)—erases key provisions and words in the statute that gives "incentives for proven strategies." 42 U.S.C. § 11386b(d). Congress allowed for bonuses and incentives for particular activities and then also relaxed how those bonuses and incentives could be used for applicants who successfully implement those activities.

Finally, Congress's direction and HUD's prior practices show that incentives exist in the context of competitions and not just after selection. *Contra* Defs.' Suppl. Mem. at 4. For example, Congress had previously directed HUD to include specific healthcare incentives into the HUD CoC program. In 2024, Congress appropriated over $3.4 billion for the Continuum of Care program and directed HUD to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid rehousing services. *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 344, 363-64,

Div. F, Tit. II (2024). Following Congress's direction, HUD's 2024-25 NOFO awarded up to fourteen additional scoring points to CoCs who included new permanent supportive housing and rapid rehousing service projects that demonstrated coordination with housing providers and healthcare organizations. *See* HUD-AR-00752, HUD-AR-00830-32. Thus, contrary to HUD's argument, "incentives" as used in 42 U.S.C. § 11386b(d)(1), includes incentives that apply during the grant selection process.

HUD's set-aside of over one billion dollars is a "colossal amount of grant funding" and undoubtedly an incentive. *Washington III*, 2026 WL 2279514, at *3. The set-aside "incentivizes grantees to conform their CoC programs to HUD's goals in order to obtain a realistic chance of obtaining this funding." *Id.*; *see, e.g.*, ECF No. 36-1 (Washington State declarant explaining the set-aside would require Washington's Department of Commerce "to completely overhaul its ranking and selection process" for providers and "push providers toward project types that are less aligned with evidence-based Housing First principles"). Because this set-aside incentivizes an activity that is not a proven strategy under 42 U.S.C. § 11386b(d)(2)(a)-(b), it would have needed to fit under subsection (c) for "any other activity determined by the Secretary, based on research *and after notice and comment to the public*, to have been proven effective at reducing homelessness." *Id.* (emphasis added). Defendants failed to engage in notice-and-comment, and their

arguments to the contrary fail. *See generally* Pl. States' Opp'n to Defs.' Mot. for Stay Pending Appeal at 19-23.

RESPECTFULLY SUBMITTED this 2nd day of September 2026.

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES
ALIANA KNOEPFLER
Assistant Attorneys General
CRISTINA SEPE
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Cristina.Sepe@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**LETITIA JAMES**
Attorney General of New York

*/s/ Judith Vale*
RABIA MUQADDAM
Chief Counsel for Federal Initiatives
JUDITH VALE
Deputy Solicitor General
28 Liberty Street
New York, NY 10005
212-416-6274
Rabia.Muqaddam@ag.ny.gov
Judith.Vale@ag.ny.gov
*Attorneys for Plaintiff State of New York*

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ Hayleigh S. Crawford*
HAYLEIGH S. CRAWFORD
Deputy Solicitor General
WILLIAM Y. DURBIN
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL
Deputy Attorney General
MICHAEL L. NEWMAN
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD
LAUREN GREENAWALT
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov
*Attorneys for Plaintiff State of California*

**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov
*Attorney for Plaintiff State of Connecticut*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ
Deputy Solicitor General
NORA PASSAMANECK
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov
Nora.Passamaneck@coag.gov
*Attorneys for Plaintiff State of Colorado*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Caroline S. Van Zile*
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General
for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
202-724-6609
Caroline.VanZile@dc.gov
*Attorney for Plaintiff*
*District of Columbia*

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
ROBIN L. JACOBS
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
Vanessa.Kassab@delaware.gov
Robin.Jacobs@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Sarah A. Hunger*
SARAH A. HUNGER
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
312-814-5202
sarah.hunger@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Laurac.Tipton@ky.gov
*Attorneys for Plaintiff Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky*

**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
KATHERINE W. THOMPSON
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Tompson@maine.gov
*Attorney for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
JLuh@oag.maryland.gov
*Attorney for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Michelle Pascucci*
KATHERINE DIRKS
Chief State Trial Counsel
MICHELLE PASCUCCI
NITA KLUNDER
State Trial Counsel
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov
*Attorney for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

*/s/ Brian S. Carter*
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.Carter@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

*/s/ Daniel Resler*
DANIEL RESLER
Assistant Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@njoag.gov
*Attorney for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
ASamant@nmdoj.gov
*Attorney for the State of New Mexico*

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Robert A. Koch*
ROBERT A. KOCH
Attorney-in-Charge, Civil & Administrative Appeals
Oregon Department of Justice
1162 Court St NE
Salem, OR 97301
Tel: 503-378-4402
Robert.a.koch@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

**JENNIFER C. SELBER**
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER
STEPHEN R. KOVATIS
Deputy General Counsel
Michael J. Fischer
Executive Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
717-460-6786
*Attorneys for Plaintiff Governor Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE
Solicitor General
SAM STRATTON
Assistant Attorney General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov
Sam.Stratton@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

**JAY JONES**
Attorney General of Virginia

*/s/ Megan C. Keenan*
MEGAN C. KEENAN
Deputy Solicitor General
Tillman J. Breckenridge
Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
tbreckenridge@oag.state.va.us
*Attorneys for Commonwealth of Virginia*

NO. 26-1922

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,

Defendants-Appellants.

APPENDIX TO PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANTS-APPELLANTS' SUPPLEMENTAL MEMORANDUM

**For: Ronnie Kurtz, Assistant Secretary for Community Planning and Development**

**From: Caitlyn McKenney, Deputy Assistant Secretary for Community Planning and Development's Office of Special Needs**

**Subject: Review FY26 CoC NOFO**

**INTRODUCTION.**

This recommendation memo outlines the policy goals and objectives proposed for the FY26 CoC NOFO as HUD works to reform its homelessness programs. In doing so, I also outline the relevant facts and data that informed the policy decisions. The NOFO has substantial differences compared to CoC NOFOs under previous Administrations.

**BACKGROUND.**

The FY26 appropriation Act directs HUD to publish a FY26 CoC NOFO by June 1, 2026.[1] Between the beginning of this Administration in January 2025 and today, HUD has consistently informed the public—and CoC stakeholders in particular—that HUD is making a "paradigm shift" away from the failures of Housing First policy and towards recovery and self-sufficiency. Further, the President signed two Executive Orders implicating HUD and HUD homelessness programs in particular: *Ending Crime and Disorder on America's Streets*[2] and *Addressing Addiction through the Great American Recovery Initiative*.[3]

One of the primary policy initiatives of HUD, and specifically of CPD, has been to reform homelessness programs, especially the CoC program—the single largest Federal homelessness program. Since the beginning of 2025, CPD leadership has met with numerous stakeholders on the issue of homelessness including while visiting service providers and crisis hotspots such as Skid Row in downtown Los Angeles where thousands of people fill the sidewalks and streets in tents and RVs as gangs and drug traffickers prey on them.[4] Los Angeles City Officials declared Skid Row a "Typhus Zone" in 2018.[5] HUD has also organized and attended 40 local forums across 19 states and the District of Columbia to convene homelessness stakeholders including CoC recipients, law enforcement, local elected officials, and healthcare providers.

---

[1] Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2026 (2026 Appropriations Act), Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, H.R. 7148.
[2] Exec. Order No. 14321, 90 Fed. Reg. 35,817 (July 29, 2025).
[3] Exec. Order No. 14379, 91 Fed. Reg. 5,081 (Feb. 3, 2026).
[4] Jamie Paige, *Gangs Operating Out of Tents, RVs on Skid Row in Los Angeles*, New York Post (May 28, 2026), https://nypost.com/2026/03/01/us-news/gangs-operating-out-of-tents-rvs-on-skid-row-in-los-angeles/.
[5] Dennis Romero & Andrew Blankstein, *'Typhus zone': Rats, trash infest Los Angeles' Skid Row, fueling outbreak*, NBC News (Oct. 15, 2018), https://www.nbcnews.com/news/us-news/typhus-zone-rats-trash-infest-los-angeles-skid-row-fueling-n919856.

and treatment, or criminalizing homelessness. Claims to the contrary do not change this fact.

The following discussion will examine HUD's historical stance on Housing First and the body of research on the outcomes of a Housing First approach to homelessness. In 2022, HUD's Office of Policy Development and Research (PD&R) published an issue of its *Evidence Matters* newsletter on the topic of Housing First.[24] When describing Housing First, the authors focus heavily on the "no preconditions" aspect of the model rather than the "no participation requirements." However, today, HUD finds that the weakness in the nation's homelessness system is not that too few entities condition assistance on sobriety, but rather that too few entities create the accountability and structure needed to help an addict recover or a young person finish school and find meaningful employment. Even the *Evidence Matters* report acknowledged that the first program to implement Housing First—Pathways to Housing—initially required program participants to agree to two staff visits per month. This is the kind of participation requirement that HUD seeks to advance now. The study cited by HUD in *Evidence Matters* compared Pathways to Housing to "treatment first" programs that *preconditioned* housing on treatment. As mentioned above, HUD is not advancing preconditions in the NOFO.

Advocates for Housing First claim that the approach is not "one-size-fits-all" because participants get to choose from a range of interventions and services. HUD finds that while this may be the intention of the model, the historical practice of funding housing subsidies to the exclusion of services has resulted in a one-size-fits-all approach on the ground.[25] The NOFO includes rating criteria to incentivize the existence of and investment in these critical services.

Proponents of Housing First often refer to the approach as "evidence-based," but the reality is that a robust body of evidence on homelessness assistance and outcomes is lacking. And what evidence exists is mixed. A 2021 systematic review of 26 studies found that participants in Housing First assistance compared to "treatment first" assistance had an 88% decrease in days spent homeless during the evaluation period (based on one study) and a 41% increase in days spent housed during the evaluation period.[26] Physical health, mental health, alcohol use, and illegal drug use all had unfavorable or negligible outcomes in Housing First assistance compared to "treatment first". Most of the studies assessed

---

[24] Office of Policy Dev. & Research, U.S. Dep't of Housing & Urban Dev., *Evidence Matters: Transforming Knowledge into Housing and Community Development Policy* (Spring/Summer 2023), https://docs.huduser.gov/archives/portal/sites/default/files/pdf/EM-Newsletter-spring-summer-2023.pdf.
[25] See quote above from provider about the "seismic shift" in 2013.
[26] Yinan Peng et al., *Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health Among Homeless Populations with Disability: A Community Guide Systematic Review*, 26 J. Pub. Health Mgmt. Prac. 404 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC8513528/.

comprehensive range of on-site services." But as discussed above, it is this level of supportive service provision that HUD finds lacking in the current system and seeks to incentivize and invest in during this competition.

Further, today HUD finds that Transitional Housing is a missing component in the Continuum of Care for helping individuals and families reach self-sufficiency. While the level of service investment may cost more than housing alone, HUD finds that the net results of self-sufficiency over indefinite dependence on a federal housing subsidy are likely to outweigh the initial investment in services. While the 2010 report refers to Transitional Housing as merely a "way station for people waiting for voucher assistance," HUD today finds this to be an unfair characterization both of what Transitional Housing was intended to be and how it operates today. The FY26 NOFO rejects the idea that any form of homelessness assistance should be merely a "way station" for more government assistance or a "hammock" for lifelong government assistance.[51]

Because of the decline in Transitional Housing supply, it's difficult to find recent studies on the effectiveness and outcomes of Transitional Housing compared to other forms of housing assistance. As discussed earlier, a 2010 study of clients placed in treatment or transitional housing prior to independent living compared to clients placed directly in independent living found that individuals placed directly into independent housing had "more days in their own place ... but no differences on other clinical or community adjustment outcomes."[52]

For subpopulations such as homeless youth, data suggests that Transitional Housing has positive outcomes for housing and employment. A study released by Covenant House International found that among youth exiting Transitional Housing programs across 15 U.S. cities, 73% exited to stable housing and 69% were employed or in school upon exit. When youth stayed in transitional housing for at least one year, these percentages increased to 83% and 75% respectively.[53] HUD believes that the provision of structure and quality supportive services driving these outcomes is facilitated in part by the site-based provision of housing that allowed under Transitional Housing and not under Rapid Rehousing.

HUD collects system performance data that tracks outcomes between each of the components of the CoC program. This data indicates that Rapid Rehousing has the highest level of increases in earned income, despite low levels of earned income increases across

---

[51] Sec. Scott Turner (@secretaryturner), *Social Safety Nets*, Instagram (Apr. 21, 2025), https://www.instagram.com/reel/DIufOe8RHe1/.
[52] Jack Tsai, Alvin S. Mares & Robert A. Rosenheck, *A Multi-Site Comparison of Supported Housing for Chronically Homeless Adults: "Housing First" Versus "Residential Treatment First"*, 7 Psychol. Serv. 219 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC3151537/.
[53] *See* Covenant House Int'l, Nat'l Network for Youth & Sch. House Connection, *supra* note 17, at 23.

all CoC project types. However, HUD finds that differences in performance outcomes are likely to be an artifact of the difference in acuity of needs between participants in Permanent Supportive Housing—where disability is an eligibility requirement—and Rapid Rehousing. By making speed the primary goal, Rapid Rehousing self-selects the easiest to serve populations.

HUD used to support Transitional Housing. In 2010, HUD's PD&R study stated that "Transitional Housing has been an important element of the Department's efforts to respond to the housing needs of homeless families and individuals."[54]

Only three years later, HUD would pivot decisively against Transitional Housing.

HUD finds that the time between 2007 and 2013 (when HUD first started collecting PIT count data and when HUD stopped investing in Transitional Housing) provided only six years to observe the national outcomes of the homelessness response and make a drastic pivot away from Transitional Housing. Now, HUD has two decades of homelessness data and 13 years of data spanning HUD's single-minded investment in Permanent Housing. During those first six years (2007 to 2013), homelessness decreased 8.8%. During the last 23 years (2013 to 2026), homelessness increased 27%,[55] not to mention the other negative outcomes described above. It is well past time for HUD to recognize that funding Transitional Housing is a necessary part of the CoC program.

HUD has carefully considered that, by creating a large set-aside for new TH and SSO projects, renewal projects will be limited. HUD acknowledges that current PSH and RRH renewal projects have historically relied on a near-guarantee of future funding and that a significant investment in new Transitional Housing is likely to impact both existing permanent housing providers and the individuals they serve. HUD has taken numerous steps to provide clarity and guidance that provides a path for both current providers and current participants to maintain funding and assistance under the structure of the NOFO. Again, HUD has organized nearly 40 forums with key stakeholders all over the country and had numerous other discussions with CoC recipients and other homelessness providers. HUD has also issued numerous public statements in national media outlets, social media, and other outlets about HUD's intent to end Housing First and return the program to diverse solutions that incentivize self-sufficiency and recovery. This includes lengthy policy discussion and detailed program requirements contained in the FY25 December NOFO and the forthcoming FY26 NOFO.

---

[54] U.S. Dep't of Hous. & Urb. Dev., *Life After Transitional Housing* (2010), https://www.huduser.gov/portal/publications/pdf/LifeAfterTransition.pdf
[55] 2025 AHAR.

The NOFO also makes consistent reference to the "transition grant" opportunity. This option, authorized in the FY26 appropriations act, allows existing Permanent Housing renewal grants to transition from one project component to another (i.e., TH or SSO) over the course of a year.[56] While HUD wants to ensure that existing renewal projects have the opportunity to secure funding as a new type of project, HUD also wants to see the applicant pool broadened to first-time recipients. The transition grant opportunity combined with a generous set-aside for new projects balances these competing interests.

HUD has also published guidance on the eligibility and recordkeeping requirements as they relate to individuals moving from permanent housing to transitional housing.[57] HUD acknowledges the concern that current permanent housing residents would not qualify for transitional housing because they do not meet the definition of "literal homelessness."[58] However, such residents may very well meet the definition of "at imminent risk of homelessness." HUD does not construe any of its regulatory requirements to require an individual in permanent housing to sleep on the street for a night in order to be eligible for transitional housing. According to the guidance, residents currently living in permanent housing projects may be eligible for assistance in transitional housing projects. No one should be prohibited from moving from indefinite government assistance to time-limited government assistance. The NOFO consistently promotes and incentivizes reducing unsheltered homelessness and connecting individuals and families to assistance and services that help those who are able recover and regain self-sufficiency. HUD's proposed investment in *a different form of housing assistance* should not change the number of people who can be served with that assistance while it may change who provides the assistance. The FY26 funding available is more than HUD has ever previously made available, and HUD intends to award it in full.

Because of the set-aside for new TH, the NOFO does not include an option for new "joint TH-RRH" projects. The joint TH-RRH project option is not a component described in statute or regulation and adds unnecessary complexity to an already-complex program and NOFO. The NOFO does not impact existing joint projects but rather encourages TH projects.

The NOFO has a set-aside of $104 million for new Domestic Violence (DV) projects (FY26 and FY25 set-aside authorized by appropriation). The appropriations language allows HUD

---

[56] Consolidated Appropriations Act, 2026, Pub. L. 119-75, div. D, tit. II, § 226(a), 140 Stat. 173, 418 (Feb. 3, 2026).
[57] Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *Program Participants' Eligibility to Move from Permanent Supporting Housing (PSH) / Rapid Re-Housing (RRH) To Transitional Housing (TH)* (2024), https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf.
[58] U.S. Dep't of Hous. & Urb. Dev., *Category 1: Literally Homeless*, HUD Exch., https://www.hudexchange.info/homelessness-assistance/coc-esg-homeless-eligibility/four-categories/category-1/.

The NOFO incentivizes CoCs to partner with a wide array of treatment providers to advance treatment and recovery for individuals with a SUD or Serious Mental Illness (SMI). These rating criteria include identifying partnerships with specialty courts and other Assisted Outpatient Treatment (AOT) providers, encouraging the CoC to leverage court orders to advance recovery. It also includes investment and partnerships to provide peer support, counseling, recovery housing, and access to detox support. The NOFO also scores CoCs on their ability to identify barriers to using involuntary commitment as an intervention tool to connect the most hard-to-treat populations with appropriate levels of care.

Proponents of Housing First and "harm reduction" claim that participation in treatment and services must always be voluntary. They argue that treatment that is accepted voluntarily is more effective and leads to better outcomes than mandatory treatment. While HUD is not advancing mandatory treatment in this NOFO generally, there is research that supports the effectiveness of AOT over voluntary treatment. A study in New York found that AOT patients had decreased rates of hospitalization and increased engagement in outpatient treatment.[83] The NOFO does not incentivize, and certainly does not require, treatment requirements across the board. It does incentivize CoCs to use their own PIT count data on the number of individuals who self-report chronic substance abuse to create beds/units dedicated to treatment, in which assistance is conditioned on participation in treatment. CoCs that already have these services and beds in place, or who are willing to create them, indicate to HUD that they are better equipped to serve this subpopulation and optimize self-sufficiency for all subpopulations.

The NOFO advances treatment and recovery by incentivizing CoCs to coordinate with behavioral healthcare providers, provide access to detox beds, invest in on-site treatment provision, create recovery housing, and dedicate units to the purpose of treatment and recovery.

The NOFO also provides bonus points to CoCs whose projects do not permit the use or distribution of illicit drugs on their premises. Critics believe that a restriction on illicit drug use prevents individuals from maintaining housing while in treatment or recovery (including relapse). The data above shows the opposite: enabling drug does not reduce overdose deaths and may contribute to fewer recoveries and more deaths. Further, the NOFO does not create an incentive to require *sobriety* nor to require eviction for first-time violation. Program participants may be at varying stages in their recovery journey, and the taxpayer-funded housing they reside in should support and facilitate that recovery, not enable deadly drug use.

---

[83] Marvin S. Swartz et al., *Assessing Outcomes for Consumers in New York's Assisted Outpatient Treatment Program*, 61 Psychiatric Servs. 976 (2010), https://pubmed.ncbi.nlm.nih.gov/20889634/.

**U.S. Department of Housing and Urban Development**

Community Planning and Development

FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants
FR-6800-N-25
02/09/2026

Signature Date

**3. CoC Program Provisions.**

The following list highlights important information that applicants should consider as they are preparing the FY 2024 - 2025 CoC Application and project applications(s). This is not an exhaustive list of considerations or requirements; therefore, all applicants should carefully review the Rule for comprehensive information.

**a. Performance-Based Decisions.** Consistent with the requirements of the Consolidated Appropriations Act, 2024:

**(1)** Requests for new CoC project applications , except for new projects created through reallocation, are not allowed, unless the CoC evaluates and competitively ranks projects based on how they improve the CoC's system performance as outlined in section V.B.2.b of this NOFO; and

**(2)** HUD will prioritize funding for CoCs that have demonstrated the capacity to reallocate funding from lower to higher performing projects.

**b. Indian Tribes or Tribally Designated Housing Entities (TDHEs).** The Consolidated Appropriations Act, 2021 amended Title IV of the Act by adding Section 435 so designated Indian Tribes or TDHEs (as defined in Section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) may:

**(1)** create a CoC;
**(2)** be a Collaborative Applicant;
**(3)** be an eligible project applicant; or
**(4)** receive grant amounts from another entity that receives a grant directly from HUD (i.e. be a CoC grant subrecipient).

However, under 42 U.S.C. 11383(g) only States, Units of General Local Government, nonprofit organizations, and Public Housing Agencies may administer permanent housing rental assistance.

**c. Coordination with Housing and Healthcare.** The Consolidated Appropriations Act, 2024 directs HUD to provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid rehousing services. In the FY 2024 - 2025 CoC Program Competition, CoCs may receive up to 14 points on the CoC Application if the FY 2024 CoC Priority Listing includes new project applications created through reallocation or the CoC Bonus that utilizes housing vouchers and healthcare provided through an array of healthcare services providers. See section V.B.6 of this NOFO for additional details.

**d. Consolidation Project.** Project applicants can consolidate two but no more than ten eligible renewal projects during the application process. The projects being combined during a grant consolidation will continue uninterrupted. To be eligible for consolidation, the projects must have the same recipient (as evidenced by recipient's Unique Entity Identifier) and be for the same component. Additionally, YHDP projects cannot consolidate with non-YHDP projects. See section III.B.4.a.(7) of this NOFO for additional information.

| | | |
|---|---|---|
| | | employment cash sources in the CoC was 50 percent or higher as reported in HDX (2 of the 7 points);<br>• describe the strategy their CoCs implemented to access employment and non-employment cash sources;<br>• describe how their CoCs are working with mainstream employment organizations to help individuals and families experiencing homelessness increase their cash income; and<br>• identify the organization or position that is responsible for overseeing their CoC's strategy to increase jobs and income growth from employment and non-employment cash sources, including mainstream employment organizations. |
| ***g. HMIS Performance Measures.*** Submit data quality report that describes the data quality for system performance | **4** | Collaborative Applicants must demonstrate their CoC submitted FY 2023 System Performance Measures data in HDX 2.0 by the submission deadline of 6:00 PM ET on March 13, 2024, or an alternate date approved by HUD. |

**6. Coordination with Housing and Healthcare.** As stated in section I.B.3.c of this NOFO, HUD will award up to 14 points to CoCs that submit new PSH and RRH project applications demonstrating coordination with housing providers and healthcare organizations.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| ***a. Leveraging Housing Resources.*** These points are available for CoCs that apply for at least one new PSH or RRH project that utilizes housing subsidies or subsidized housing units not funded through the CoC or ESG programs. Housing subsidies or subsidized housing units may be | **7** | CoC's will receive full points by demonstrating that they have applied for at least one PSH or RRH project that utilizes housing subsidies or subsidized housing units not funded through the CoC or ESG programs. Collaborative Applicants must demonstrate that these housing units will:<br>1. in the case of a PSH project, provide at least 25 percent of the units included in the project; or<br>2. in the case of a RRH project, serve at least 25 percent of the program participants anticipated to be served by the project. |

| | | |
|---|---|---|
| funded through any of the following sources:<br><br>• Private organizations;<br>• State or local government, including through the use of HOME funding provided through the American Rescue Plan;<br>• Public Housing Agencies, including through the use of a general or limited preference;<br>• Faith-based organizations; or<br><br>Federal programs other than the CoC or ESG programs. | | CoCs must attach letters of commitment, contracts, or other formal written documents that demonstrate the number of subsidies or units being provided to support the project.<br><br>CoCs can receive less than full points for demonstrating commitments less than the threshold described above. |
| ***b. Leveraging Healthcare Resources.*** These points are available for CoCs that apply for at least one PSH or RRH project that utilizes healthcare resources to help individuals and families experiencing homelessness. Sources of health care resources include:<br><br>• Direct contributions from a public or private health insurance provider to the project (e.g., Medicaid), and<br>• Provision of health care services by a private or public organization (e.g., | **7** | Collaborative Applicants must demonstrate through a written commitment from a health care organization that:<br><br>1. in the case of a substance use disorder treatment or recovery provider, it will provide access to treatment or recovery services for all program participants who quality and choose those services; or<br>2. the value of assistance being provided is at least an amount that is equivalent to 25 percent of the funding being requested for the project, which will be covered by the healthcare organization.<br><br>Acceptable forms of commitment are formal written agreements and must include: |

| | | |
|---|---|---|
| Ryan White funded organization) tailored to the program participants of the project.<br><br>Eligibility for the project must comply with HUD program and fair housing requirements. Eligibility criteria cannot be restricted by the eligibility requirements of the health care service provider. | | • value of the commitment, and<br>• dates the healthcare resources will be provided.<br><br>In-kind resources must be valued at the local rates consistent with the amount paid for services not supported by grant funds.<br><br>CoCs can receive less than full points for demonstrating commitments less than the threshold described above. |

**7. CoC Merger Bonus Points.** As stated in section I.B.2.b.(4) of this NOFO, HUD will award up to a possible 25 bonus points to CoCs that merged in the period between FY 2023 and FY 2024 CoC Program Registration deadlines based on the following structure. The minimum number of bonus points a merged CoC may receive is 5 with the maximum number of points available at 25.

| **Rating Factor** | **Maximum Points** | **To Receive Maximum Points** |
|---|---|---|
| ***a. Merged CoCs between FY 2023 CoC Program Registration and FY 2024 CoC Program Registration.*** | **5** | Merged CoCs - all CoCs that merged will receive this minimum number of points. |
| ***b. CoC Application score in FY 2022 or FY 2023.*** | **10** | One or more of the merged CoCs had a CoC Application score of 140 points or below in the FY 2022 or FY 2023 CoC Program Competitions. HUD will review the FY 2022 and FY 2023 CoC Applications and award 10 bonus points if at least one of the merged CoCs meet this criterion. |
| ***c. Point in Time Counts*** | **10** | Collaborative Applicants must demonstrate that the results of their Point-in-Time counts reported in the Homelessness Data Exchange (HDX) were affected by changes in methodology that resulted from the merger in a way that would affect their CoC score. To receive these bonus points for mergers, the CoC |